# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | : | |
| COREY DAVIS, | : | CIVIL ACTION NO. |
| Petitioner, | : | 3:12-CV-1628 (JCH) |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| Respondent. | : | MARCH 20, 2015 |
| | : | |

## RULING RE: PETITION PURSUANT TO 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY (Doc. No. 1)

Petitioner Corey Davis, currently serving a 293-month sentence of imprisonment following his plea of guilty to one count of sex trafficking, moves to vacate his conviction and plea of guilty so that he may proceed to trial.   See Petition Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("Petition") (Doc. No. 1); 28 U.S.C. § 2255.[1]   Davis alleges that he did not voluntarily enter the Plea Agreement and complains of several other inadequacies with respect to the proceedings resulting in his sentence.   For the reasons set forth below, no evidentiary hearing is required, and Davis' Petition (Doc. No. 1) is denied.

## I.   BACKGROUND

A first grand jury returned a ten-count Indictment, United States v. Davis, No. 3:07-CR-11-JCH (Crim. Case Doc. No. 6), against Davis on January 18, 2007, and a

---

[1] Davis submitted with the Petition a document entitled "Petition for Habeas Corpus" (Doc. No. 1-1).   The court construes this document as a memorandum in support of the Petition and will refer to it as the "Legal Memorandum," "Memorandum," or simply "Mem."   Davis also submitted a supplemental memorandum ("Supp. Mem.") (Doc. No. 39) and accompanying Affidavit of Corey Davis ("Davis Affidavit") (Doc. No. 39-1) in response to the court's Order to Show Cause (Doc. No. 22), and, finally, a second supplemental memorandum ("Second Supp. Mem.") (Doc. No. 49).

second grand jury returned a fifteen-count Superseding Indictment (Crim. Case Doc. No.

70) on August 23, 2007, principally charging that Davis had committed conspiracy to

transport, and actual transportation, of minors for immoral purposes, 18 U.S.C. §§ 371,

2423; transportation of an individual for immoral purposes, 18 U.S.C. § 2421; sex

trafficking, 18 U.S.C. § 1591; forced labor, 18 U.S.C. § 1589; kidnapping, 18 U.S.C. §

1201; and document servitude, 18 U.S.C. § 1592.

After numerous delays, on the eve of trial Davis pled guilty pursuant to a Rule

11(c)(1)(C) Plea Agreement (Crim. Case Doc. No. 158).   See Change of Plea Hearing

Transcript (Crim. Case. Doc. No. 202); Fed. R. Crim. P. 11(c)(1)(C).   Pursuant to the

Plea Agreement, Davis only pled guilty to one count, Count Six, for sex trafficking as to

one victim; the remaining counts were dismissed.   See Plea Agreement; Change of Plea

Hearing Transcript; Change of Plea Hearing Minute Entry (Crim. Case Doc. No. 156).

Pursuant to the Agreement, Davis stipulated to, inter alia, the following offense conduct:

> In or about May 2005, the defendant, while operating as a pimp, knowingly and
> unlawfully recruited, enticed, harbored, transported, provided, and obtained a
> person, identified as MV #1, for purposes of causing MV #1 to engage in
> commercial sex acts. At this time, the defendant knew that MV #1 was under 18
> years of age and was a vulnerable victim. He knowingly used force, fraud, and
> coercion, including threats of serious harm and physical restraint, to compel MV #1
> to engage in commercial sex acts. He knowingly benefitted financially and
> received things of value, including money, from his participation in a venture that
> engaged in recruiting, enticing, harboring, transporting, providing, and obtaining
> MV # 1 for purposes of engaging in commercial sex acts.

Plea Agreement at 14.   The Plea Agreement contained a waiver of rights to appellate

review and to attacking the conviction or sentence collaterally.   It provided:

> Waiver of Right to Appeal or Collaterally Attack Sentence
>
> The defendant acknowledges that under certain circumstances he is entitled to
> appeal his conviction and sentence. 18 U.S.C. § 3742. It is specifically agreed that
> the defendant will not appeal or collaterally attack in any proceeding, including but

not limited to a motion under 28 U.S.C. §§ 2255 and/or 2241, the conviction or sentence of imprisonment imposed by the Court if that sentence does not exceed 293 months' imprisonment, a period of supervision of life, and a $200,000 fine, even if the Court reaches a sentencing range permitting such a sentence by a Guideline analysis different from that specified above, as well as the forfeiture of his property. The defendant expressly acknowledges that he is waiving his appellate rights knowingly and intelligently.

Id. at 7.

The court permitted Davis to change his plea only after a lengthy colloquy in which the court ensured that Davis was "enter[ing] a guilty plea that [wa]s voluntary and . . . ma[d]e related waivers knowingly, intelligently, and with sufficient awareness of the relevant circumstances and likely consequences." United States v. Ruiz, 536 U.S. 622, 629 (2002) (alterations and quotation marks from original omitted); Change of Plea Hearing Transcript.   On September 19, 2008, the court accepted Davis' plea of guilty. See Order Accepting Defendant's Plea of Guilty (Crim. Case Doc. No. 197).   On November 18, 2008, Davis moved to withdraw his plea pursuant to Rule 11(d)(2).   See Fed. R. Crim. P. 11(d)(2); Motion to Withdraw Defendant's Guilty Plea (Crim. Case. Doc. No. 205).   Finding no good cause to allow Davis to withdraw his plea. the court denied the Motion.   See Ruling on Defendant's Motion to Withdraw Guilty Plea (Crim. Case. Doc. No. 208).

On December 19, 2008, the court sentenced Davis principally to 293 months' imprisonment.   See Sentencing Hearing Transcript (Crim. Case Doc. No. 242); Judgment (Crim. Case Doc. No. 225).   After a lengthy direct appeal process and the finalization of Davis' conviction, Davis filed the present Petition, which was docketed on November 15, 2012.   See Petition.

3

## II.     STANDARD OF REVIEW

"Because requests for habeas corpus relief are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." Ciak v. United States, 59 F.3d 296, 301 (2d Cir. 1995), abrogated on other grounds by Mickens v. Taylor, 535 U.S. 162 (2002). "[C]ollateral attack on a final judgment in a criminal case is generally available under [section] 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in complete miscarriage of justice." Graziano v. United States, 83 F.3d 587, 589–90 (2d Cir. 1996) (citation and internal quotation marks omitted).

In a section 2255 motion, the burden is on the petitioner to prove by preponderance of the evidence his entitlement to relief. See Napoli v. United States, 45 F.3d 680, 683 (2d Cir.1995); Gotti v. United States, 622 F.Supp.2d 87, 91 (S.D.N.Y.2009). The general rule that a court must construe pro se litigants' pleadings liberally "to raise the strongest arguments that they suggest" applies equally in the context of section 2255 motions. Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001).

In deciding a section 2255 motion, the court must hold a hearing, "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). However, a petitioner is not automatically entitled to a hearing, and no hearing is required where a petitioner's "allegations are 'vague, conclusory, or palpably incredible.'" Gonzalez v. United States, 722 F.3d 118, 130 (2d Cir. 2013) (quoting Machibroda v. United States, 368 U.S. 487, 495 (1962)); see

also United States v. Aiello, 814 F.2d 109, 113–14 (2d Cir. 1987) ("Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing.").   "The procedure for determining whether a hearing is necessary is in part analogous to, but in part different from, a summary judgment proceeding."   Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009).   "To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief."   Gonzalez, 722 F.3d at 131.

## III.   DISCUSSION

Davis argues that the court should vacate his conviction and allow him to withdraw his guilty plea and proceed to trial.   Davis pled guilty pursuant to a plea agreement that contained a waiver of his right to attack his conviction or sentence collaterally and did so after a lengthy colloquy with the court on the record.   See Plea Agreement at 7; Change of Plea Hearing Transcript at 53.   If it is valid, the waiver in the Plea Agreement bars him from pursuit of the relief that he presently seeks.   However, Davis presents numerous reasons why, he argues, the decision to plead guilty and waive his rights was not voluntarily made and the waiver is thus unenforceable.   These arguments may be grouped into two categories: prosecutorial misconduct and ineffective assistance of counsel.   The court first addresses the timeliness of the Petition.   Next, it addresses the legal standard applicable to challenges such as Davis' and the basic facts of Davis' plea colloquy, then Davis' two categories of substantive arguments and, finally, arguments that speak to issues beyond the voluntariness of the decision to plead guilty and waive collateral-attack rights.

5

A.    Timeliness

It appeared to the court that there was some question whether Davis' filing of the Petition was timely under the governing statute of limitations.   See 28 U.S.C. § 2255(f). Accordingly, the court issued an Order to Show Cause (Doc. No. 22), in response to which Davis filed, inter alia, a sworn Declaration (Doc. No. 23 at 4) averring that he had handed off the Petition to his prison's mail system on October 3, 2012, which was one year, to the day, after the Supreme Court denied a petition for a writ of certiorari as to his appeal of the judgment of conviction that he now challenges.   See Hardy v. Conway, 162 F. App'x 61, 62 (2d Cir. 2006); Houston v. Lack, 487 U.S. 266 (1988).   In light of Davis' sworn statement, the court finds that the Petition was timely filed.   The court thus proceeds to consider the Petition on the merits.

B.    Challenges to validity of waiver of right to attack conviction collaterally

Davis appears to have waived his right to attack his conviction collaterally, such that he would normally be precluded from maintaining the present action for relief under section 2255.   See Tellado v. United States, 745 F.3d 48, 53 (2d Cir. 2014).   A criminal defendant may waive his right to appeal or collaterally attack his conviction pursuant to a plea agreement negotiated with the government.   See id.   The Second Circuit has repeatedly upheld the validity of such waivers where the record clearly demonstrates that they were made knowingly, voluntarily, and competently.   United States v. Coston, 737 F.3d 235, 237 (2d Cir. 2013).   Under this Circuit's precedents, a waiver is enforceable except in limited circumstances, such as where it violates certain fundamental rights, see id., or where the government breached the terms of the plea agreement, United States v. Rosa, 123 F.3d 94, 98 (2d Cir. 1997).   See also United States v. Buissereth, 638 F.3d

114, 118 (2d Cir. 2011) (describing other exceptions).    Absent an applicable exception, a

waiver will generally bar review of other meaningful errors.    Coston, 737 F.3d at 237

(citing United States v. Riggi, 649 F.3d 143, 147 (2d Cir. 2011)).    The Second Circuit has

repeatedly recognized the benefits of upholding such waivers both to defendants, in

terms of limiting their exposure at sentencing, and to the government, in terms of saving

resources and achieving finality.    See Garcia-Santos v. United States, 273 F.3d 506, 509

(2d Cir. 2001); United States v. Rosa, 123 F.3d 94, 97 (2d Cir. 1997).

> Davis' Plea Agreement states, in relevant part:
>
> Waiver of Right to Appeal or Collaterally Attack Sentence
>
> The defendant acknowledges that under certain circumstances he is entitled to appeal his conviction and sentence.    18 U.S.C. § 3742.    It is specifically agreed that the defendant will not appeal or collaterally attack in any proceeding, including but not limited to a motion under 28 U.S.C. §[ ] 2255 . . . , the conviction or sentence of imprisonment imposed by the Court if that sentence does not exceed 293 months' imprisonment . . . .    The defendant expressly acknowledges that he is waiving his appellate rights knowingly and intelligently.

Plea Agreement at 7.

Rule 11 requires that the court, before accepting a defendant's plea of guilty,

advise him of any provision of a plea agreement "waiving the right to appeal or to

collaterally attack the sentence" and determine that he understands such provision. Fed.

R. Crim. P. 11(b)(1)(N).    The court conducted a thorough canvass of Davis consistent

with Rule 11's requirements and found that he was knowingly and voluntarily entering into

the Plea Agreement, that he was fully competent to enter an informed plea, and that he

understood the nature and consequences of what he was doing by pleading guilty.

There is no evidence in the record of coercion, incompetence, or any lack of

understanding on Davis' part of his legal and constitutional rights, including those that he

would be giving up by pleading guilty.   In particular, the court recalls that it ensured that Davis understood his right to appeal or collaterally attack his sentence and expressly advised him that the Plea Agreement included a waiver of any such right as long as the term of imprisonment imposed did not exceed 293 months.   See Change of Plea Hearing Transcript at, e.g., 18–19, 43–45.   The court also determined that he had "had read the agreement and discussed it and all the attachments with" his attorney.   Id. at 50.   Based on these facts and the rest of the court's canvass of Davis at the change of plea hearing, the court concludes that Davis' plea was "voluntary" and that his waiver of his right to appeal or collaterally attack his sentence was made "knowingly, intelligently, and with sufficient awareness of the relevant circumstances and likely consequences."   United States v. Ruiz, 536 U.S. 622, 629 (2002) (alterations and quotation marks from original omitted).

Even if the plea colloquy is impeccable, however, a defendant may argue that the waiver is unenforceable because it was not given knowingly, voluntarily, and competently—for example, because it was the result of Brady violations or ineffective assistance of counsel.   See Frederick v. Warden, Lewisburg Corr. Facil., 308 F.3d 192, 195 (2d Cir. 2002) ("[A] waiver of appellate or collateral attack rights does not foreclose an attack on the validity of the process by which the waiver has been procured, here, the plea agreement.").

Davis argues that his waiver is unenforceable because it was not voluntarily given. He contends that his decision to enter the agreement was influenced by the government's failure to disclose certain material impeaching or exculpatory evidence and his counsel's ineffectively assistance.

8

C.    Failure to disclose material impeaching or exculpatory evidence

Davis alleges that three individuals were informants for, or cooperators with, the government in the case and that the government did not reveal the facts of these individuals' cooperation.   He also alleges that the government was in possession of, and withheld, certain material exculpatory evidence from these same individuals.   On the basis of these allegations, he alleges that his decision to plead guilty and waive his right to attack his conviction and sentence collaterally was not voluntary, and seeks relief from the court accordingly.

1.    Applicable legal standard

The Second Circuit has held that a "defendant is entitled to make th[e] decision [to plead guilty] with full awareness of favorable material evidence known to the government," and that, as a consequence, Brady rights extend not just to trial, but also to the plea-bargaining process.   "Although a guilty plea is generally considered valid so long as the plea was intelligent and voluntary, the validity of the plea must be reassessed if it resulted from impermissible conduct by state agents . . . includ[ing] Brady violations." United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998); see also Brady v. Maryland, 373 U.S. 83, 87 (1963).

In United States v. Ruiz, the Supreme Court undercut the aforementioned reasoning in Avellino (whose facts dealt with impeachment evidence) when it held that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant."   536 U.S. 622, 633 (2002).   The Ruiz Court reasoned, inter alia, that impeachment information need not be disclosed because access to it is a trial right; in the context of a plea, while more

9

information will make a defendant "more aware . . . of the likely consequences" of giving

up the right, a defendant is generally only entitled to "understand the nature of the right

[being waived] and how it would likely apply in general in the circumstances—even

though the defendant may not know the specific detailed consequences of invoking it."

Id. at 630.   The Court further emphasized that "the Constitution . . . does not require

complete knowledge of the relevant circumstances, but permits a court to accept a guilty

plea, with its accompanying waiver of various constitutional rights, despite various forms

of misapprehension under which a defendant might labor."   Id.

The Second Circuit has not addressed whether its pre-Ruiz statements that

plea-context Brady rights extend beyond impeachment evidence to exculpatory

evidence, see, e.g., Avellino, 136 F.3d at 255, survive Ruiz, see Friedman v. Rehal, 618

F.3d 142, 153 (2d Cir. 2010) (acknowledging that Ruiz did not reach this issue).

Because the court is bound to apply, and prosecutors to follow, binding Second Circuit

precedent, the court proceeds on the premise that the Brady rule applies in the

plea-bargaining context only to exculpatory evidence, but not to impeachment evidence.

> 2.   The allegations

The sum total of the alleged Brady evidence that Davis contends was not

disclosed was, with respect to three individuals, (a) the fact that each of these individuals

was a cooperator or informant, and (b) certain exculpatory evidence that some or all of

these individuals rendered to the government up to the time of Davis' plea.

> a.   Kern Stewart

The first individual is Kern Stewart, a.k.a. "Trini."   Davis alleges that Stewart was,

"at all times he interacted with Davis," an informant.   See Mem. at 77–84.   He also

alleges that Stewart made reports to the government that contradict certain factual allegations relating to Davis' interactions with one of the minor victims in the case that the government relied upon to meet its burden before the grand jury when seeking to indict Davis.   See id.   Davis claims that, had he known that Stewart was an informant and/or had access to the evidence that Davis alleges Stewart gave to the government, he would not have pled guilty because he would have had a basis for moving to dismiss the indictment or going to trial.

Davis' allegations here are not "supported by competent evidence," Gonzalez v. United States, 722 F.3d 118, 131 (2d Cir. 2013), but only "[a]iry generalities, conclusory assertions and hearsay statements," United States v. Aiello, 814 F.2d 109, 113–14 (2d Cir. 1987).   See also Dalli v. United States, 491 F.2d 758, 761 (2d Cir. 1974) (affirming denial of habeas corpus petition where the statements in "the Cassino affidavit, which is the crux of the petition . . . [we]re not only vague, indefinite and conclusory but marbled with hearsay").   Although he makes numerous assertions regarding Stewart's alleged cooperation with the government, none of them are supported by evidence that would support the granting of Davis' Petition for a Writ of Habeas Corpus.   They all rest entirely on Davis' unsworn statements/arguments in his Legal Memorandum.   This is insufficient to support habeas relief.

b.    Ayana Jenesse Brown

The second individual is Ayana Jenesse Brown.   Davis alleges that Brown was an "informant" or "cooperat[or]" with the government.   See id. at 84–88.   Brown, Davis alleges, is an "exotic dancer" who "worked for" Davis; Davis further alleges that he "did not use any form of compulsion to make [her] work for him," and that the government knew

this fact because Brown reported the facts of her interactions with Davis to the government.   Davis claims that, had it been disclosed that Brown were an informant/cooperator, he would not have pled guilty and would have gone to trial because her testimony would show that he did not use coercion to make her work for him, from which conclusion a juror could further conclude that he did not use coercion to make any woman work for him.

This claim fails for the same reason as the last, see Part III.C.2.a supra, as well as at least two more reasons.   First, Davis has not explained why the government's alleged withholding of the fact of Brown's cooperation would prevent him from having her testify at trial.   Second, and more importantly, the court recalls ruling during the course of pretrial proceedings that Davis would not be allowed to introduce evidence that Davis did not always coerce women to work for him for the purpose of proving that he did not coerce the specific individuals as to whom he was actually charged with coercing prostitution.   In any case, the court now reiterates that it would not have allowed Davis to introduce such evidence.   As a consequence, any evidence of this kind that Davis alleges was withheld from him cannot have been "material" evidence within the meaning given by Brady and its progeny, and thus cannot justify the relief that Davis presently seeks.   See, e.g., United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998).

c.   Shamere McKenzie

The third individual is Shamere McKenzie. It appears that, although the government informed Davis that McKenzie was cooperating against Davis as to the criminal case that forms the basis for the conviction that Davis now challenges, Davis alleges that McKenzie was actually cooperating earlier and/or to a greater extent than the

government ever revealed.   See id. at 88–91.   Davis also alleges that the government is in possession of recordings of conversations between McKenzie and Davis secretly made by McKenzie.   He claims that these recordings will show that McKenzie's grand jury testimony is "rife with perjury."   Id. at 90.

As with the prior two claims, Davis' only support for his allegations is his own set of unsworn statements.   He presents no evidence that any of the purported recordings exist—only his theories.   This is not enough.   See Aiello, 814 F.2d at 113–14.   His claim thus fails.

      D.    Ineffective assistance of counsel

Davis alleges not only that the government committed certain Brady violations that affected the voluntariness of his decision to plead guilty and waive his right to attack his conviction and sentence collaterally, but also that ineffective assistance of counsel affected the voluntariness of the same decision.   Davis alleges many instances of ineffective assistance.   The court will address each of them in turn.

      1.    Applicable legal standard

Just as in certain cases a Brady violation in connection with the plea-bargaining process may invalidate the waiver of a defendant's right to attack his conviction collaterally in such an agreement, so may the fact that a defendant was ineffectively assisted by counsel in connection with his entering a plea agreement.   Parisi v. United States, 529 F.3d 134, 139 (2d Cir. 2008).   Such allegations are subject to the well-established test under the Supreme Court's decision in Strickland v. Washington, which requires a defendant to show both deficient performance by his counsel and

prejudice to him as a result.   466 U.S. 668, 687 (1984); see also Hill v. Lockhart, 474 U.S. 52, 58–59 (1985) (applying Strickland to context of advice about whether to plead guilty).

The Second Circuit has described this burden as "a heavy one because, at the first step of analysis, [a court] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."   Harrington v. United States, 689 F.3d 124, 129 (2d Cir. 2012) (citations and internal quotation marks omitted). To show the second step's requisite prejudice, a petitioner must show that "counsel's constitutionally ineffective performance affected the outcome of the plea process.   In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."   Hill, 474 U.S. at 59.   The Hill Court further explained:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial.   For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.   Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.   See, e.g., Evans v. Meyer, 742 F.2d 371, 375 ([7th Cir.] 1984) ("It is inconceivable to us . . . that [the defendant] would have gone to trial on a defense of intoxication, or that if he had done so he either would have been acquitted or, if convicted, would nevertheless have been given a shorter sentence than he actually received").   As we explained in Strickland v. Washington, [466 U.S. 668 (1984)], these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker."   Id. . . . at 695 . . . .

Hill, 474 U.S. at 59–60 (emphases added).

14

More recently, the Second Circuit narrowed <u>Hill</u>'s objectivity somewhat when it concluded that a district court erred when,

> in assessing whether there was a reasonable probability that, absent [the attorney]'s allegedly substandard performance, [the defendant] would have gone to trial, the district court did not mention the plainly relevant fact . . . that [the defendant] had actually attempted to withdraw his plea of guilty and go to trial. . . . [T]he strength of the government's evidence and the severity of the possible punishment are not always determinative on the issue of whether, in the absence of substandard advice from counsel, a particular defendant would have decided to plead guilty or to go to trial.

<u>Gonzalez</u>, 722 F.3d 118, 132–33 (2d Cir. 2013).

### 2.   Failure to challenge indictment

Davis claims that his decision to plead guilty was not voluntary because it was predicated on his attorney's misadvice—in response to Davis' bringing certain prosecutorial misconduct to his attorney's attention—that he had no legal right to challenge an indictment obtained based on such misconduct.   He claims that, had he known of such a right, he would not have pled guilty and would instead have moved to dismiss the indictment.

Davis alleges that prosecutors actually committed, and that he raised with his attorney, two forms of misconduct: reliance on evidence obtained from an illegal search and subornation of perjury.

### a.   Illegal search

Davis claims that the government obtained the Indictment in part by the use of photos and a spent shell casing obtained during a search of a residence in Queens, New York, which search he claims was illegal.   <u>See</u> Mem. at 29–37.   He claims that he pointed his attorney to individuals who could corroborate that the search was conducted

illegally, but that his attorney never investigated these allegations, let alone challenged the Indictment on this basis.

However, even assuming that this argument were otherwise viable, Davis presents no evidence tending to show that his attorney's not moving to dismiss the Indictment prejudiced him, i.e., that any of the grounds for his challenge to the validity of the search that produced photographs used in the Indictment had any merit.   He does not even present an affidavit of his own, let alone one from anyone else, nor any other form of proof, among the "mound of evidence" to which he claims that he pointed his then-attorney.   See Mem. at 31.   Davis thus fails to "set forth specific facts supported by competent evidence," Gonzalez v. United States, 722 F.3d 118, 131 (2d Cir. 2013), rather than "[a]iry generalities, conclusory assertions and hearsay statements," United States v. Aiello, 814 F.2d 109, 113–14 (2d Cir. 1987), with respect to this argument.[2]   See also Dalli v. United States, 491 F.2d 758 (2d Cir. 1974) (affirming denial of habeas corpus petition where the statements in "the Cassino affidavit, which is the crux of the petition . . . [we]re not only vague, indefinite and conclusory but marbled with hearsay," id. at 761).

> b.   Subornation of perjury

Davis also claims that the government obtained the Indictment in part by perjury obtained knowingly.   Davis asserts in his Legal Memorandum that he informed his attorney of various "fabrication[s]," "lie[s]," etc. in the testimony presented to the grand jury, and that he explained to his attorney why many of these alleged fabrications were

---

[2] Davis also claims that his attorney "agreed to admit [the shell casing]" and "the photos into evidence."   Mem. at 30, 37.   Like Davis' argument regarding his attorney's failure to seek dismissal of the Indictment for its reliance on these fruits of an allegedly illegal search, Davis' argument that his attorney should have made efforts to prevent these items from being admitted as evidence fails because Davis proffers no evidence in support of it.

not just "perjurous" but also "easily proven to be so."   See Mem. at, e.g., 19–21.   Yet

again, however, Davis presents no competent evidence in support of these

contentions—only his own assertions in his Memorandum.   Indeed, the only actual

evidence that Davis presents on this subject matter is a mere summary statement in a

submission to the court subsequent to the submission of the Petition that simply states "I

asked [my a]ttorney . . . to file a motion to dismiss the indictment based on my contention

based on my contention that the indictment was obtained by use of knowingly perjured,

and suborned perjured testimony.   [He] informed me that I had no right to seek dismissal

of the indictment."   Davis Affidavit ¶ 4(a).   This summary statement is, of course,

insufficient to warrant an evidentiary hearing.   But, even interpreting the entire Legal

Memorandum as an affidavit, Davis' claims fare no better.   Davis mere allegation that he

told his attorney that testimony was false is not sufficient to warrant an evidentiary

hearing.   Davis has submitted no competent evidence that any of the grand jury

testimony was perjurous, let alone that prosecutors suborned such alleged perjury, nor

finally any explanation for why, even if any of these claims were true, his attorney's failure

to file a motion to dismiss the indictment was prejudicial.   See Part III.D.2.a. supra.

       3.    Advice regarding defense expert witness

Davis also makes a claim or claims relating to the expert witness whose testimony

the government planned to introduce at trial.   Davis alleges, without any further

explanation, that his attorney "advised [him] that there was no one in the social science

field that could testify to challenge the government's expert witness['] opinions."   Davis

Affidavit ¶ 8(d).   He also alleges that he wanted to have his own expert interview the

alleged victims.   See Mem. at 40; Davis Affidavit ¶ 4(c).

These allegations, even if assumed to be true and to reflect inappropriate decisions or advice by an attorney, are meritless because Davis does not explain how he was prejudiced.   Davis does not explain how or why he believed at the time that his inability to challenge the government's expert witness made a difference in his view of his case such that he decided to plead guilty.   Nor does he explain what about the testimony of the expert witness he would have wanted to have challenged, or how he would have been able to succeed in such a challenge.

Nor can the court discern in its independent judgment how Davis might have been prejudiced.   As the court recalls, the expert witness was impeccably well-qualified. Davis' simple assertion that he said he wished to challenge the witness and was told he could not is thus not only insufficient because it does not show a challenge would have succeeded, but also because he has given no basis on which to challenge the witness and because no such basis is apparent.

Moreover, the court recalls that the government intended to introduce the testimony of the expert witness largely to lay general conceptual foundations regarding the pimp-prostitute relationship rather than, say, to establish the factual allegations constituting the core of the government's case.   Accordingly, even if Davis were going to challenge the witness' testimony, it is difficult to imagine how Davis, or any defendant, might expect that doing so would make a meaningful difference in the strength of his case.

Finally, to the extent that the expert, who had interviewed the victims, would have given testimony central to the government's proof of the specific allegations in the Indictment—namely, if it is imagined that she would somehow be a linchpin between

18

testimony by the victims and establishment of some element or elements of the crimes charged—the court can discern (and, to reiterate, Davis has established) no prejudice in his attorney's alleged failure to seek an independent examination by a defense expert.   It is, at best, dubious to assume that such an examination would have been allowed, given the requirement that a specific showing of need be made, and, were any such examination allowed, quite unlikely that it would have been helpful.   See United States v. Rouse, 111 F.3d 561, 566–68 (8th Cir. 1997) (noting that "[a]n adult witness may simply refuse to undergo adversarial medical or psychological examinations," id. at 567, and that the question whether child victims will be made available for such examiantions is within the discretion of the district court, which is to weigh a "defendant['s] showing of need for the[ ] examinations" based on, inter alia, the qualifications of the government's examiners, id.).

Accordingly, Davis' general complaint of inadequate challenge to the government's expert witness is not enough to warrant relief here.

4.    Counsel's refusal to investigate certain facts of the case

Davis claims that his attorney "refused to call, or even interview, any of the 100+ women that had formerly worked with [Davis] that could testify that [Davis] never used threats of violence to get women to work for [him]."

This claim fails for at least two reasons.   First, it is not credible because, if Davis means to imply that he was coerced into pleading guilty because he felt that his case was weaker than it might have been because of his attorney's lack of diligence, Davis' statements at the plea colloquy that he was satisfied with his attorney's work contradict this claim.

Second, even if it were credible, the attorney's failure to seek out testimony from the "100+ women [who] could testify" that Davis did not coerce them into prostitution was not prejudicial because, as already stated, see Part III.C.2.b supra, the jury would not have heard such testimony.

Third, Davis has not presented competent evidence from any of these "100+ women" that supports his claim that their testimony would have shown that he did not compel women to work for him.

     5.    Counsel's failure to obtain a flight manifest that would have identified a certain defense witness

Davis alleges, much as he did in the prior claim, that his counsel was deficient because he failed to obtain (and perhaps stated that he was not entitled to seek access to) a manifest listing passengers from a certain flight.   Davis claims that one passenger on this flight could testify that she was never coerced into working for Davis.   Even were this claim otherwise competently supported, any statement or omission to act that resulted in Davis' inability to get in touch with the possible witness that he wished to identify was not prejudicial to his case because the court would not have permitted testimony of the kind that Davis claims he would have wanted.   See Part III.C.2.b supra.

     6.    Counsel's failure to inquire as to age of minor witness

Davis alleges that, at one point, his attorney notified him that the government intended to have a certain woman testify at trial, that she was going to testify that she was a minor when she "worked for" Davis, and that "he had seen the documentation verifying that she was in fact a minor."   Davis Affidavit ¶ 8(a).   Davis denied that she was a minor or that she ever worked for him.

Davis does not allege that his attorney never contacted this witness, but even if the court assumes that he did not contact her, the court can neither say that the failure to call her constituted ineffective assistance.   Davis simply claimed that the facts of this alleged victim's proposed testimony were false; he does not explain how the omission to investigate by attempting to contact the witness (assuming there was such an omission) actually prejudiced his case in any way.

7.      Direct access to seized mobile phones or other physical evidence

Davis complains that his attorney did not permit Davis to access, or perhaps pursue Davis' right to access, certain evidence.   Davis specifically refers to "three telephones that were seized pursuant to Davis' arrest."   Mem. at 41.   However, as with several of Davis' other claims, even assuming there is merit to the substance of the ineffective assistance claim, Davis shows no prejudice.   He only says that the phones contained "valuable witness contact information" and "highly exculpatory photos and text messages."   Id.   However, Davis freely admits that Keating had access to the phones, see id., and he does not claim that there is any special reason why his inability to access the phones somehow caused him prejudice, leading him to plead guilty when he otherwise would not have done so.   Instead, his claim appears to be a generalized grievance with his attorney's performance.   Such dissatisfaction is irrelevant to the merits of a claim of ineffective assistance of counsel.

8.      Advice regarding scienter element as to victim's age

Davis' next claim is that his attorney advised him that "the government did not have to prove that [he] knew the alleged minor victim was a minor" in order to obtain a

conviction.   In essence, this claim is that his attorney inadequately advised him as to one of the elements of one of the crimes with which he was charged.

This claim is "palpably incredible."   Gonzalez, 722 F.3d at 130 (internal quotation marks omitted).   As for the first, Davis explicitly affirmed at the plea colloquy that, inter alia, he knew how to read and write English, that he had "read the agreement and discussed it and all the attachments with" his attorney, and that he was satisfied with his attorney's advice with respect to the Plea Agreement.   See Change of Plea Hearing Transcript at 3, 7, 11, 50.   Not only did the court adduce that Davis' conduct fit the elements of the crime, but the Plea Agreement explicitly listed the mens rea requirement as to the age of the victim as one of the elements of the offense, and the stipulation of offense conduct attached thereto explicitly acknowledged that Davis met the mens rea requirement.   See id. at 39–40; Plea Agreement at 1, 14 (stating that "the defendant knew that M[inor] V[ictim] #1 was under 18 years of age").   The court concludes that Davis was indeed advised by his counsel fully of this element of the crime of conviction. See United States v. Cabrera, 563 F. App'x 861, 863 (2d Cir. 2014) ("A defendant's statements during the plea colloquy are not to be taken lightly because '[s]olemn declarations in open court carry a strong presumption of verity.   The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.'" (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977))).

> 9.    Representation that government would not seek forfeiture of home

Davis premises his next claim on the allegation that his attorney "advised [him] that if [he] pled guilty that the government would not seek the forfeiture of" a certain home as

to which the government did in fact seek forfeiture.   Davis Affidavit ¶ 8(c).   He claims

that he would not have pled guilty had he known that the government were going to seek

forfeiture of this property.

This claim is incredible for the same reason as the last.   An agreement regarding

forfeiture was incorporated as part of the Plea Agreement and discussed explicitly at the

plea colloquy.   See Plea Agreement at 2–3; Change of Plea Hearing Transcript at 10.   It

is simply unbelievable that Davis was misled as to the nature of the agreement, given his

many representations at the plea colloquy, including but not limited to his representations

as to his ability to comprehend the terms of the agreement and his representation that he

had indeed reviewed it.

> 10.   Advice as to length of sentence stipulated in the Plea Agreement and
> obligation to accept this stipulation

Davis premises another claim on the allegation that his attorney advised him that

"the sentencing range was 19-21 years," or (during earlier discussions) even lower,

although "the actual sentencing range in the plea agreement was for between 23 and 24

1/2 years," and, further, that, during an off-the-record discussion with his attorney in the

middle of the plea colloquy, his attorney "told [him] that [he] had to accept the agreement

with that range."   Construing these allegations "to raise the strongest arguments that

they suggest," Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001), the court

concludes that Davis is making two arguments here.   Here, too, the court rejects Davis'

arguments for the same reason as it rejected the last.

Davis' first argument appears to be that he did not know that the stipulated range of

lengths for the sentence of imprisonment to be imposed was as high as the Plea

Agreement in fact provided that it was.   Of course, this fact was plain on the face of the

23

Agreement.   See Plea Agreement at 7.   In addition to confirming that Davis had read the Plea Agreement and discussed it with counsel, see Change of Plea Hearing Transcript at 7, 50, the court explicitly discussed this range of possible sentences of imprisonment with Davis, see id. at 18–19, before Davis executed the Agreement, see id. at 51.   Davis' second argument appears to be that his attorney coerced him to accept the Agreement. However, Davis' statements during the colloquy render this allegation baseless.   The court concludes that the voluntariness of Davis' decision to plead guilty pursuant to the Agreement rather than to pursue some alternative course (such as going to trial) was not affected by any alleged statement by Davis' attorney that he "had to accept the agreement with that range."

> 11.   Advice that Davis "had to agree to plead" despite innocence

Davis also alleges quite simply that his attorney told him that he "had to agree to plead to the charges, and related offense conduct, related to the alleged minor, even though I told him that it was a lie.   He told me that 'this case is all about the twelve year old' and 'just let them have their pound of flesh.'"   Davis Affidavit ¶ 8(g).

As it should be needless to say, if Davis means to claim that he was actually coerced by this alleged instruction from his attorney—in other words, that "I am innocent and would have gone to trial, but my lawyer simply told me I had to plead guilty, so I did"—this claim is simply not credible.   Davis' sworn statements at the plea colloquy flatly contradict, and thus preclude, the simple and conclusory allegation that he pled because his attorney instructed him to do so rather than of his own voluntary choice.

12.    Bargaining regarding pursuit of criminal charges against Davis'
family members

Davis alleges that he was induced to plead guilty because his attorney told him

"that the government would pursue criminal charges against members of [Davis'] family if

[he] did not accept a plea bargain."   Davis Affidavit ¶ 8(b).

This claim fails for multiple reasons.   First, were it true, it fails to state that the

government violated the alleged bargain, and, as a consequence, that the plea was

somehow involuntary.   See Smith v. Blackburn, 785 F.2d 545, 548 (5th Cir. 1986).

Second, the colloquy between the court and Davis at the change-of-plea hearing and the

terms of the Plea Agreement render Davis' claim incredible.   Davis confirmed having

read and understood the Agreement, whose final paragraph, labeled "No Other

Promises," demonstrate that no such promise existed.   Plea Agreement at 10.   The

court also specifically inquired of Davis whether he had been made any promises outside

of those described in the Agreement, which he answered in the negative.   See Change

of Plea Hearing Transcript at 45–46.

13.    General allegation of disappointment with attorney's assistance

Davis also claims generally that he lost faith in his attorney's ability and willingness

to represent him effectively at trial, and that he entered the Plea Agreement for this

reason.   See Supp. Mem. at 2.[3]   However, the court thoroughly canvassed Davis on this

---

[3] As Davis argues:

Throughout the course of his representation of Mr. Davis, [Davis' attorney] provided Mr. Davis with
false information regarding his legal rights in the case. . . . The false information affected Mr. Davis'
faith in [the attorney]'s ability and willingness to effectively represent him at a trial of the case.   That
set in motion Mr. Davis' willingness to consider a plea offer from the Government, despite insisting
on his innocence of the crimes charged.

and related points, and he confirmed in open court, under the penalty of perjury, before

the undersigned, precisely the opposite: that he <u>was</u> satisfied with his attorney's advice in

the course of his representation and services.   <u>See</u> Change of Plea Hearing Transcript

at, <u>e.g.</u>, 4, 7, 11.[4]   The court will not lightly ignore these statements as Davis now seeks

to relitigate the question of his criminal liability that he chose to resolve with the Plea

Agreement six and a half years ago.   <u>See</u> <u>Cabrera</u>, 563 F. App'x at 863.

        14.    Strength of government's case

As an additional reason to reject Davis' various foregoing arguments regarding

ineffective assistance of counsel in choosing to plead guilty, the court makes a final note

regarding the <u>Strickland</u>/<u>Lockhart</u> inquiry.   Because of the strength of the government's

case, it is especially dubious that Davis could overcome the prejudice prong of this

inquiry, even if his claims otherwise had merit.[5]

---

Supp. Mem. at 2 (citations omitted).

    [4] Some of the many relevant interactions at the plea colloquy included the following:

THE COURT: . . . Have you had an opportunity to read that indictment and to discuss what the charges are with Attorney Keating before today?
THE DEFENDANT: Yes.

Change of Plea Hearing Transcript at 4.

THE COURT: Are you satisfied with the representation and services that Attorney Keating has provided you in the case?
THE DEFENDANT: Yes.

<u>Id.</u> at 7.

THE COURT: You had a chance to discuss all of the terms in [the Plea Agreement] with Attorney Keating before today?
THE DEFENDANT: Yes.

<u>Id.</u> at 11.

    [5] The same reasoning applicable here is also applicable to Davis' <u>Brady</u> claims in light of <u>United</u>

Not every infirmity in a defendant's understanding of the strength of his case rises to the level of a due process violation rendering his entry into a plea agreement less than voluntary.   See Ruiz, 536 U.S. at 630; see also discussion of Ruiz Part III.C.1 supra. Here, the government's evidence against Davis was overwhelming.   It included sworn testimony from all of the victims identified in the Superseding Indictment, two of whom were minor victims.   Moreover, Davis' co-conspirator agreed to cooperate with the government.   See Government's Response to Order to Show Cause Regarding Additional Discovery (Doc. No. 32) at 3.   In light of this and the rest of the evidence available to Davis when he decided to plead guilty, and the fact that, by entering into the Plea Agreement with the government, Davis was able to avoid the very high risk of a life sentence if convicted at trial, the court concludes, "without regard for the 'idiosyncrasies of the particular decisionmaker,'" that "there is [no] reasonable probability that, but for counsel's [alleged] errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial."   Hill, 474 U.S. at 59–60.

Under the guidance of the Gonzalez decision, the court has also considered whether there is a reasonable probability that Davis in particular (and not some abstract rational defendant) would not have pled had he known of the scope of his attorney's alleged failures.   See 722 F.3d at 132.   The court notes that Davis, like the petitioner in Gonzalez, did move to withdraw his guilty plea after he had entered it.   This Motion (Crim. Case Doc. No. 205) was based in large part on the same arguments about Davis' being driven to plead guilty because of his lack of faith in his attorney that the court has

_____

States v. Bagley, 473 U.S. 667, 682 (1985), see Part III.C.2 supra, and to Davis' claims of inadequate assistance of counsel with respect to post-plea proceedings, see Part III.E infra.

just rejected as implausible in light of Davis' sworn statements at the plea colloquy.   See discussion Part III.D.13 supra.   The court's consideration of what Davis in particular would have done in the absence of the alleged ineffective assistance of counsel, as Gonzalez requires, does not change the court's conclusion: it is simply incredible that any change in the evidence that Davis believed, based upon alleged ineffective assistance, would be presented to a jury would have meaningfully affected Davis' view of the case, such that he would have decided not to plead guilty had he then been working with a different (and in any case an effective) attorney.

* * *

For the foregoing reasons, the court finds that any claim by Davis that his plea and related waivers were anything other than "voluntary[,] knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences" is wholly without merit.   Brady v. United States, 397 U.S. 742, 748 (1970) (as quoted in Ruiz, 536 U.S. 622, 629 (2002)).

E.   Challenges beyond voluntariness of waiver

Davis complains of several more inadequacies in his conviction and sentence that he claims requires the court to grant his section 2255 motion.

1.   Advice regarding right to withdraw plea

Davis complains that, although he wanted to withdraw his plea after the change -of-plea hearing and before the court accepted it, he was "as blind as Ray Charles" with respect to his right to do so under Federal Rule of Criminal Procedure 11(d)(1).   Mem. at 61.   He says that his attorney "[a]t no time . . . advise[d him] that he" had the right to withdraw his plea, Supp. Mem. at 8, "for any reason or for no reason."   Fed. R. Crim. P.

11(d)(1).   His new attorney, too, apparently "advised [him] that [he] needed to strengthen and document [his] claim that [prior counsel] was ineffective before he could file his appearance and file a motion to withdraw [the] plea. . . . At no time did [new counsel] advise" him of his right to withdraw his plea under Rule 11(d)(1).   Davis also complains that neither the Plea Agreement nor the court advised him of his right under Rule 11(d)(1). See Mem. at 57–76.

None of these allegations bear on the voluntariness of Davis' plea.   Because the court's sentence was within the range prescribed in the Plea Agreement provision waiving collateral-attack rights, any complaints about Davis' attorneys' failure to advise him of certain rights or to take action in accordance with those rights cannot be the subject of a motion under section 2255.   See United States v. Cabrera, 563 F. App'x 861, 862 (2d Cir. 2014) ("Many of Cabrera's arguments miss the point, and cannot avoid the plea waiver, because they focus on pre-plea and post-plea events rather than the plea agreement process.");   United States v. Djelevic, 161 F.3d 104, 107 (2d Cir. 1998) ("emphatically reject[ing]" the contention that a defendant sentenced within the range stipulated by a waiver of appellate rights can nonetheless appeal based on ineffective assistance of counsel at sentencing).

Moreover, there is no requirement that a plea agreement or a court advise a defendant of his right to withdraw his plea.   In light of Rule 11's specific enumeration of topics as to which the court must canvass the defendant during a plea colloquy, see, e.g., Fed. R. Crim. P. 11(b), (c)(3)(B); (c)(4), and the lack of any similar indication that a court is required to advise a defendant of his right to withdraw his plea under Rule 11(d)(1), a very strong implication exists that the defendant has no right to be informed by the court of his

right to withdraw his plea under Rule 11(c)(1)(C).   See Kucana v. Holder, 558 U.S. 233, 248–49 (2010) (endorsing expressio unius canon).   Moreover, while "waiver of . . . important federal rights . . . demands the utmost solicitude of which courts are capable" to ensure that an accused knows what rights he is giving up, there is no general right for a defendant to be advised by the court of every right he retains, at the plea colloquy or otherwise.   Boykin v. Alabama, 395 U.S. 238, 243 (1969); see also United States v. Salim, 690 F.3d 115, 123–24 (2d Cir. 2012).

Davis' ignorance of this right under Rule 11(d)(1) at the time of his entry into the Plea Agreement cannot have worked any prejudice against him.   That he retained more rights than he realized—rather than that he was giving up some additional right—was only a bonus, so to speak.   While the court is not generally required to advise a defendant of every right he is giving up, then, see United States v. Journet, 544 F.2d 633, 635–36 (2d Cir. 1976) (stating Rule 11 "codif[ies] the advice required to be given" regarding rights that a defendant is waiving before he changes his plea), it is all the more unfounded that a defendant should complain when a court does not advise him of a right that he retains.

Finally, the court briefly notes that, in a Memorandum submitted to the court approximately seventeen months after the original Petition, Davis appears to argue that the court breached a promise relied upon by Davis in entering the Plea Agreement.   See Second Supp. Mem. at 8.   Specifically, Davis claims that the court promised not to accept his guilty plea until sentencing, and that its entry of an order accepting the guilty plea before sentencing violated this promise.   Even assuming the dubious propositions that Davis would be allowed to amend the Petition to add this claim at such a late date

(which he has not sought to do, despite filing the Second Supplemental Memorandum with the assistance of counsel), and assuming that the court did so promise, this argument fails because, inter alia, it is not supported by, and is indeed controverted by, the evidence that Davis presents.   Davis admits repeatedly that his execution of the Plea Agreement rested on the belief that he did not have the right to withdraw his guilty plea after the change-of-plea hearing.   See, e.g., Mem. at 61 (stating that, "at the plea hearing, . . . [Davis] had no knowledge of . . . his right [to] withdraw[ ]" his guilty plea). Nowhere in any of his filings does Davis provide any competent evidence that he understood a right to withdraw his guilty plea to be part of the plea bargain.   Indeed, he necessarily relies on the very opposite contention—that he had no knowledge that such a right existed, let alone relied upon his understanding that he had this right when he decided to bind himself to the Plea Agreement—in his strenuous arguments that his attorney provided him ineffective assistance.   This argument thus fails.

> 2.    Subsequent inadequate assistance of counsel

Davis also complains that the attorneys with whom he worked after the change-of-plea hearing were inadequate in several ways, including: (i) that his attorney, although hired to withdraw plea, did not do so; (ii) that, although the attorney promised to review all of the evidence, he did not do so; (iii) that the motion to withdraw his plea under Rule 11(d)(2), subsequent to the court's acceptance of the plea, was inadequately done; and (iv) that counsel misrepresented to Davis certain facts about the motion to withdraw under Rule 11(d)(2), for example, by failing to tell him that the court had already ruled on it when he first showed the motion to Davis.   See Mem. at 44–56.

Assuming that any of these concerns would have merit but for Davis' waiver, the court concludes that Davis cannot pursue them at this time because he validly waived his right to collaterally attack his sentence as long as it fell within the range stipulated in the Plea Agreement.   See Djelevic, 161 F.3d at 107.   Thus, Davis is barred from pursuing these claims through a motion under section 2255.

## IV.   CONCLUSION

The Petition (Doc. No. 1) is **DENIED**.   Moreover, because Davis has not made a "substantial showing" of denial of a constitutional right, a certificate of appealability will not issue.   28 U.S.C. § 2253(c)(2).   The Clerk is directed to close the case.

**SO ORDERED.**

Dated this 20th day of March 2015 at New Haven, Connecticut.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge